IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.

CATHERINE COFFMAN,

    Plaintiff,

v.

HARVEST HEALTH & RECREATION INC.,
EULA L. ADAMS,
MICHAEL SCOTT ATKISON,
MARK NEAL BARNARD,
ANA DUTRA,
ELROY P. SAILOR, and
STEVEN M. WHITE,

    Defendants.

**COMPLAINT AND JURY DEMAND**

Plaintiff Catherine Coffman ("Plaintiff"), by and through her undersigned counsel, for her complaint against defendants, alleges upon personal knowledge with respect to herself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1. Plaintiff brings this action against Harvest Health & Recreation Inc. ("Harvest" or the "Company") and the members of its Board of Directors (the "Board" or the "Individual Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), and U.S. Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9, and to enjoin the vote on a proposed transaction, pursuant to which the Company will be acquired by Trulieve Cannabis Corp.

("Trulieve") through its affiliates Trulieve Acquisition Corp. ("Trulieve"), Mustang MergerCo Inc. ("Merger Sub") and Trulieve Intermediate Holding Corp. ("Intermediate Holdco") (the "Proposed Transaction").

2. On May 10, 2021, Harvest and Trulieve issued a joint press release announcing that they had entered into an Arrangement Agreement (the "Merger Agreement"), dated May 10, 2021, to sell Harvest to Trulieve. Under the terms of the Merger Agreement, each Harvest stockholder will be entitled to receive 0.1170 of a subordinate voting share of Trulieve for each Harvest share they own (the "Merger Consideration"). The Proposed Transaction is valued at approximately $2.1 billion.

3. On July 13, 2021, Harvest filed a Schedule 14A Definitive Proxy Statement (the "Proxy Statement") with the SEC. The Proxy Statement, which recommends that Harvest stockholders vote in favor of the Proposed Transaction, omits and/or misrepresents material information concerning, among other things: (i) Harvest's and Trulieve's financial projections; (ii) the data and inputs underlying the financial valuation analyses that support the fairness opinions provided by the Company's financial advisor Moelis & Company LLC ("Moelis") and financial advisor to the special committee of the Board ("Special Committee"), Haywood Securities Inc. ("Haywood"); (iii) potential conflicts of interest faced by Haywood; and (iv) the background of the Proposed Transaction. Defendants authorized the issuance of the false and misleading Proxy Statement in violation of Sections 14(a) and 20(a) of the Exchange Act.

4. In short, unless remedied, Harvest's public stockholders will be irreparably harmed because the Proxy Statement's material misrepresentations and omissions prevent them from making a sufficiently informed voting or appraisal decision on the Proposed Transaction. Plaintiff seeks to enjoin the stockholder vote on the Proposed Transaction unless and until such Exchange

Act violations are cured.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over the claims asserted herein for violations of Sections 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §1331 (federal question jurisdiction).

6.      This Court has jurisdiction over the defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Plaintiff's claims arose in this District, where a substantial portion of the actionable conduct took place, where most of the documents are electronically stored, and where the evidence exists.  Harvest operates and maintains a corporate office as well as a manufacturing facility in this District.  Moreover, each of the Individual Defendants, as Company officers or directors, either resides in this District or has extensive contacts within this District.

## PARTIES

8.      Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of Harvest common stock.

9.      Defendant Harvest is a British Columbia corporation with its principal executive offices located at 1155 W. Rio Salado Parkway, Suite 201, Tempe, Arizona 85281, and a corporate office and manufacturing facility located in Denver, Colorado.  Harvest is a vertically integrated cannabis company and multi-state operator.  The Company's common stock is traded on the OTC

3

Markets under the ticker symbol "HRVSF."

10. Defendant Eula L. Adams ("Adams") has been a director of the Company since December 2019.

11. Defendant Michael Scott Atkison ("Atkison") has been a director of the Company since May 2020.

12. Defendant Mark Neal Barnard ("Barnard") has been Chairman of the Board since March 2020, and a director of the Company since November 2018.

13. Defendant Ana Dutra ("Dutra") has been a director of the Company since December 2019.

14. Defendant Elroy P. Sailor ("Sailor") has been Chief Strategy Officer of the Company since January 2020 and a director since November 15, 2018.

15. Defendant Steven M. White ("White") co-founded Harvest in 2012, is Chief Executive Officer ("CEO") of the Company, and has been a director at all relevant times.

16. Defendants identified in paragraphs 10 to 15 are collectively referred to herein as the "Board" or the "Individual Defendants."

**OTHER RELEVANT ENTITIES**

17. Trulieve is a vertically integrated "seed-to-sale" company in the United States and is the first and largest fully licensed medical cannabis company in the State of Florida. Trulieve cultivates and produces all of its products in-house and distributes those products to Trulieve-branded dispensaries throughout the State of Florida, as well as directly to patients via home delivery. Trulieve is also a licensed operator in California, Massachusetts, Connecticut, Pennsylvania, and West Virginia. Trulieve shares trade on the Canadian Securities Exchange under the symbol "TRUL," and on the OTCQX Best Market under the symbol "TCNNF."

## SUBSTANTIVE ALLEGATIONS

### Company Background

18. Harvest is one of the largest multi-state vertically integrated operators in the cannabis industry in the United States that operates from "seed to sale." Harvest was established in Arizona and received its first license there in 2012. Harvest was formed to own, operate and develop certain businesses related to the cultivation, processing, distribution and sale of cannabis and cannabis related products under the "Harvest" brand in jurisdictions where such cultivation, processing, distribution and sale is authorized under applicable state law. Harvest is one of the largest operators in the state of Arizona, which is one of the largest medical cannabis markets in the country and one of the oldest regulated cannabis markets in the world. Building on its success in Arizona, Harvest has consistently grown its revenues and industry footprint every year since founding and currently operates facilities in Arizona, Arkansas, California, Florida, Maryland, Nevada, and Pennsylvania. Since 2013, Harvest has won a variety of operating awards, including seven Best Dispensary awards issued by four independent organizations, four Best Medical Cannabis Strain awards, and one Best Medical Cannabis Product award.

19. The Company owns, manufactures and distributes a portfolio of cannabis consumer packaged goods brands, including ROLL ONE, MODERN FLOWER, GOODSUN, EVOLAB, CHROMA, CO2LORS, ALCHEMY and CBX SCIENCES, to third-party licensed retail cannabis stores across the United States, as well as to select Company owned or operated retail stores. Harvest also provides support and financing to a Utah licensed medical cannabis cultivator.

20. On May 10, 2021, the Company announced its first quarter 2021 financial results and business highlights. First quarter revenue was $88.8 million, up 101% from $44.2 million in the first quarter 2020, and up 27% compared to $69.9 million in the fourth quarter of 2020. Gross profit in the first quarter was $47.9 million, compared to $18.1 million in the first quarter of 2020,

and $31.3 million in the fourth quarter of 2020. On January 22, 2021, Harvest recorded the first recreational cannabis sale in the state of Arizona at its Scottsdale location. Harvest began serving adult use customers in addition to medical patients at all 15 of its dispensaries on January 22. As of March 31, 2021, Harvest owned, operated, or managed 37 retail locations in six states, including 15 open dispensaries in Arizona. Reflecting on the Company's results, defendant White commented, "[o]ur first quarter results show the benefits of reaching impactful milestones such as the launch of recreational sales in Arizona. We are focused on our key operational and financial priorities in 2021 as we continue to build on this positive momentum."

**The Proposed Transaction**

21.     On May 10, 2021, Harvest and Trulieve issued a joint press release announcing the Proposed Transaction. The press release stated, in relevant part:

> TALLAHASSEE, Fla. and PHOENIX, May 10, 2021 -- Trulieve Cannabis Corp. ("Trulieve" or the "Company") (CSE: TRUL) (OTC: TCNNF) and Harvest Health & Recreation Inc. ("Harvest") (CSE: HARV, OTCQX: HRVSF) are pleased to announce they have entered into a definitive arrangement agreement (the "Arrangement Agreement") pursuant to which Trulieve will acquire all of the issued and outstanding subordinate voting shares, multiple voting shares and super voting shares (the "Harvest Shares") of Harvest (the "Transaction"). Under the terms of the Arrangement Agreement, shareholders of Harvest (the "Harvest Shareholders") will receive 0.1170 of a subordinate voting share of Trulieve (each whole share, a "Trulieve Share") for each Harvest subordinate voting share (or equivalent) held (the "Exchange Ratio"), representing total consideration of approximately $2.1 billion based on the closing price of the Trulieve Shares on May 7, 2021.
>
> Trulieve, a leading multi-state operator with a focus on the northeast and southeast regions of the United States, and Harvest, a leading multi-state operator with a focus on the west coast and northeast regions of the United States, have built deep, vertically integrated operations in their key markets, becoming leading operators in the United States, the world's largest regulated cannabis market.
>
> Key Transaction Highlights and Benefits
>
> - Increases Scale Across Our Hub Markets – through the creation of the largest U.S. cannabis operator on a combined retail and cultivation footprint basis;

6

- Creates the Most Profitable US MSO – with combined 2020 Adjusted EBITDA of $266 million[1,2] and combined 2021E consensus Adjusted EBITDA[3] of $461 million, delivering an unparalleled platform for continued growth;
- Delivers a Superior Existing Retail and Distribution Model – from a robust retail network of 126 dispensaries across 11 states, the combined company will have leading market shares in Arizona and Florida;
- Strong and Expanding Multi-State Presence – bolsters Trulieve's expansion in US northeast and southeast hubs in Florida, Pennsylvania and Maryland, and establishes a southwest hub in core markets including Arizona, where recreational adult use of cannabis was recently legalized;
- Optimizes Nationwide Presence – through well-established retail and wholesale channels across markets, as well as the ability to reach an estimated total addressable market of US$19.3 billion in 2025E (Arcview market estimate);
- Adds Premium Brands – to Trulieve's portfolio of in-house brands and national brand partners with a successful line of products across multiple form factors;
- Leverages Expert Operating Teams and Best Practices – from each of Trulieve and Harvest, enhancing operational excellence by combining unparalleled knowledge of, and success in winning, state license application processes and the ability to rapidly bring operations to market; and
- Accretive Transaction Reinforces Trulieve's Leading Financial Metrics – by reinforcing superior financial performance relative to peers through industry-leading margins and strong projected profitable growth.

Management Commentary

"Today's announcement is the largest and most exciting acquisition so far in our industry, creating the most profitable public multi-state operator. Importantly, our companies share similar customer values with a focus on going deep in core markets. This combination offers us the opportunity to leverage our respective strong foundations and propel us forward with an unparalleled platform for future growth," stated Kim Rivers, Chief Executive Officer of Trulieve. "Harvest provides us with an immediate and significant presence in new and established markets and accelerates our entry into the adult use space in Arizona. Trulieve and Harvest are leaders in our markets, recognized for our innovation, brands, and operational expertise with true depth and scale in our businesses. We look forward to providing best-in-class service to patients and customers on a broader national scale as we create an iconic US cannabis brand."

"We are thrilled to be joining Trulieve, a company that has achieved unrivaled success and scale in its home state of Florida," said Steve White, Chief Executive Officer of Harvest. "As one of the oldest multi-state operators, we believe our track record of identifying and developing attractive market opportunities combined with our recent successful launch of adult use sales in Arizona will add tremendous value to the combined organization as it continues to expand and grow in the coming years."

Terms of the Transaction

The Transaction will be effected by way of a plan of arrangement pursuant to the *Business Corporations Act* (British Columbia). Under the terms of the Arrangement Agreement, Trulieve will acquire all of the issued and outstanding Harvest Shares, with each Harvest Shareholder receiving 0.1170 of a Trulieve Share for each Harvest Share, implying a price per Harvest Share of US$4.79, which represents a 34% premium to the May 7, 2021 closing price of the Harvest Shares. After giving effect to the Transaction, Harvest Shareholders will hold approximately 26.7% of the issued and outstanding pro forma Trulieve Shares (on a fully-diluted basis). The Exchange Ratio is subject to adjustment in the event that Harvest completes certain interim period refinancing measures, with the potential adjustment in proportion to the incremental costs from such financing relative to the Transaction value. Additional details of the Transaction will be described in the management information circular and proxy statement (the "Circular") that will be mailed to Harvest Shareholders in connection with a special meeting of Harvest Shareholders (the "Meeting") expected to be held in the third quarter to approve the Transaction.

The Transaction has been unanimously approved by the Boards of Directors of each of Trulieve and Harvest. Harvest Shareholders holding more than 50% of the voting power of the issued and outstanding Harvest Shares have entered into voting support agreements with Trulieve to vote in favor of the Transaction.

The Arrangement Agreement provides for certain customary provisions, including covenants in respect of non-solicitation of alternative transactions, a right to match superior proposals, US$100 million reciprocal termination fees under certain circumstances and reciprocal expense reimbursement provisions in certain circumstances.

The Transaction is subject to, among other things, the approval of the necessary approvals of the Supreme Court of British Columbia, the approval of two-thirds of the votes cast by Harvest Shareholders at the Special Meeting, receipt of the required regulatory approvals, including, but not limited, approval pursuant to the Hart–Scott–Rodino Antitrust Improvements Act, and other customary conditions of closing. Approval of Trulieve Shareholders is not required. Additional details of the Transaction will be provided in the Circular.

The Board of Directors of Harvest (the "Harvest Board") has unanimously determined, after receiving financial and legal advice and following the receipt and review of a unanimous recommendation of a special committee of independent directors (the "Special Committee"), that the Transaction is in the best interests of Harvest, and that, on the basis of the Fairness Opinion (as defined herein), that the consideration to be received by the Harvest Shareholders is fair, from a financial point of view, to the Harvest Shareholders.

The Harvest Board unanimously recommends that Harvest Shareholders vote in favour of the resolution to approve the Transaction. The Special Committee obtained a fairness opinion from Haywood Securities Inc., (the "Fairness Opinion") which provides that, as at the date of such opinion and based upon and subject to the assumptions, procedures, factors, limitations and qualifications set forth therein, the consideration to be received by the Harvest Shareholders pursuant to the Transaction is fair, from a financial point of view, to the Harvest Shareholders.

Financial and Legal Advisors

Canaccord Genuity Corp. acted as exclusive financial advisor and DLA Piper (Canada) LLP and Fox Rothschild LLP acted as Canadian and United States legal counsel, respectively, to Trulieve. Canaccord Genuity Corp. also provided a fairness opinion to the Board of Directors of Trulieve.

Moelis & Company LLC acted as financial advisor and Bennett Jones LLP and Troutman Pepper LLP acted as Canadian and United States legal counsel, respectively, to Harvest. Haywood Securities Inc. provided a fairness opinion to the Special Committee.

**Insiders' Interests in the Proposed Transaction**

22. Harvest insiders are the primary beneficiaries of the Proposed Transaction, not the Company's public stockholders. The Board and the Company's executive officers are conflicted because they will receive unique benefits in connection with the Proposed Transaction not available to Plaintiff and the other public stockholders of Harvest.

23. Notably, Company insiders also stand to reap substantial financial benefits for securing the deal with Trulieve. Pursuant to the Merger Agreement, all outstanding stock options and restricted stock units ("RSUs") will vest and convert into the right to receive the Merger Consideration. The following tables summarize the number of ordinary shares, options, and RSUs held by Company insiders:

| Name and Province or State and Country of Residence | Positions(s)/Title | Harvest Shares(1) | Harvest Options(2) | Harvest RSUs |
|---|---|---|---|---|
| Steven M. White<br>Arizona, USA | Director, Chief Executive Officer | 24,270,400(3) | 2,500,000 | Nil |
| Michael Scott Atkison<br>Washington, USA | Director | 1,049,311(4) | Nil | 46,298 |
| Eula Adams<br>Colorado, USA | Director | 92,442(5) | Nil | 46,298 |
| Mark Neal Barnard<br>Singapore, Singapore | Director, Chair of the Board | 348,450(6) | 150,000 | 69,447 |
| Ana Dutra<br>Florida, USA | Director | 30,889(7) | Nil | 46,298 |
| Elroy Sailor<br>Virginia, USA | Director and Chief Strategy Officer | 349,225(8) | 900,000 | Nil |
| Deborah Keeley<br>Arizona, USA | Chief Financial Officer | 217,342 | 600,000 | Nil |
| Nicole Stanton<br>Arizona, USA | Vice President, General Counsel and Corporate Secretary | 225,000 | 700,000 | Nil |
| Joe Sai<br>Arizona, USA | Chief of Staff | 9,270,307(9) | Nil | Nil |

24. Additionally, in connection with the Proposed Transaction, Harvest's named executive officers are set to receive substantial cash bonus payments in the form of transaction bonuses, as set forth in the following table:

| Name | Transaction Bonus |
|---|---|
| William C. Lucia | $ 1,275,000 |
| David A. Alexander | $ 136,000 |
| Meredith W. Bjorck | $ 400,000 |
| Emmet W. O'Gara | $ 212,500 |
| Maria E. Perrin | $ 550,000 |
| Jeffrey S. Sherman | $ 550,000 |
| Jacob J. Sims | $ 182,500 |
| Douglas M. Williams, Jr. | $ 550,000 |

25. Moreover, certain key Harvest employees are set to receive substantial cash bonus payments in the form of retention bonuses, as set forth in the following table:

| Name | Retention Bonus |
|---|---|
| David A. Alexander | $ 255,000 |
| Meredith W. Bjorck | $ 300,000 |
| Emmet W. O'Gara | $ 318,750 |
| Maria E. Perrin | $ 412,500 |
| Jeffrey S. Sherman | $ 412,500 |
| Jacob J. Sims | $ 273,750 |
| Douglas M. Williams, Jr. | $ 412,500 |

**The Proxy Statement Contains Material Misstatements or Omissions**

26. Defendants filed a materially incomplete and misleading Proxy Statement with the SEC and disseminated it to Harvest's stockholders. The Proxy Statement misrepresents or omits material information that is necessary for the Company's stockholders to make an informed voting or appraisal decision in connection with the Proposed Transaction.

27. Specifically, as set forth below, the Proxy Statement fails to provide Company stockholders with material information or provides them with materially misleading information concerning: (i) Harvest's and Trulieve's financial projections; (ii) the data and inputs underlying the financial valuation analyses that support the fairness opinions provided by Moelis and Haywood; (iii) potential conflicts of interest faced by Haywood; and (iv) the background of the Proposed Transaction.

*Material Omissions Concerning Financial Projections for Harvest and Trulieve*

28. The Proxy Statement omits material information regarding the Company's financial projections for Harvest and Trulieve.

29. For each of the "Management Financial Projections" and "Trulieve Adjusted Management Projections," the Proxy Statement fails to disclose the financial metrics underlying (i) gross profit, (ii) EBITDA and (iii) unlevered free cash flow.

30. The omission of this information renders the statements in the "Harvest's Unaudited Financial Projections" section of the Proxy Statement false and/or materially misleading in contravention of the Exchange Act.

*Material Omissions Concerning Moelis's and Haywood's Financial Analyses*

31. The Proxy Statement describes Moelis's and Haywood's fairness opinions and the various valuation analyses performed in support of their opinions. However, the descriptions of Moelis's and Haywood's fairness opinions and analyses fail to include key inputs and assumptions underlying these analyses. Without this information, as described below, Harvest's public

11

stockholders are unable to fully understand these analyses and, thus, are unable to determine what weight, if any, to place on Moelis's and Haywood's fairness opinions in determining whether to vote in favor of the Proposed Transaction or seek appraisal.

32. With respect to Moelis's *Discounted Cash Flow Analyses*, the Proxy Statement fails to disclose: (i) quantification of the inputs and assumptions underlying the discount rate range of 9.75% to 13.50% used for Harvest; and (ii) quantification of the inputs and assumptions underlying the discount rate range of 8.75% to 11.75% used for Trulieve.

33. With respect to Haywood's A*nalysis of Select Publicly Traded Companies*, the Proxy Statement fails to disclose the financial multiples and metrics for each of the selected companies analyzed by Haywood in the analyses.

34. With respect to Haywood's *Discounted Cash Flow* analyses of Harvest and Trulieve, the Proxy Statement fails to disclose: (i) quantification of the inputs and assumptions underlying the discount rate ranges used in the analyses; (ii) quantification of the terminal values; and (iii) the implied per share ranges for Harvest and Trulieve resulting from the analyses.

35. When a banker's endorsement of the fairness of a transaction is touted to stockholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed.

36. The omission of this information renders the statements in the "Opinions of Harvest's Financial Advisors" section of the Proxy Statement false and/or materially misleading in contravention of the Exchange Act.

*Material Omissions Concerning Haywood's Potential Conflicts of Interest*

37. The Proxy Statement fails to disclose material information concerning potential conflicts of interest faced by the Special Committee's financial advisor, Haywood.

38. Specifically, the Proxy Statement fails to disclose whether Haywood has performed any past services for the Company or Trulieve and, if so, the amount of fees Haywood received for those services.

39. Full disclosure of investment banker compensation and all potential conflicts is required due to the central role played by investment banks in the evaluation, exploration, selection, and implementation of strategic alternatives.

40. The omission of this information renders the statements in the "Opinions of Harvest's Financial Advisors" section of the Proxy Statement false and/or materially misleading in contravention of the Exchange Act.

*Material Omissions Concerning the Background of the Proposed Transaction*

41. The Proxy Statement fails to disclose material information concerning the background process leading to the Proposed Transaction, including whether confidentiality agreements the Company entered into with potential counterparties contained standstill provisions or "don't-ask, don't-waive" ("DADW") standstill provisions that are still in effect and currently precluding these parties from making a topping bid for the Company.

42. The failure to disclose the existence of DADW provisions creates the false impression that a potential bidder who entered into a confidentiality agreement could make a superior proposal for the Company. If the potential acquirer's non-disclosure agreement contains a DADW provision, then that potential bidder can only make a superior proposal by (a) breaching the confidentiality agreement—since in order to make the superior proposal, it would have to ask for a waiver, either directly or indirectly; or by (b) being released from the agreement, which if action has been done, is omitted from the Proxy Statement.

43. Any reasonable Harvest stockholder would deem the fact that a likely topping bidder for the Company may be precluded from making a topping bid for the Company to significantly alter the total mix of information.

44. Additionally, the Proxy Statement fails to disclose: (i) the valuations set forth in Trulieve's January 8, 2021 and January 11, 2021 letters of intent; (ii) Trulieve's concerns with Harvest's February 3, 2021 financial analysis; (iii) the valuations set forth in Trulieve's February 26, 2021 proposal letter; and (iv) the specific terms of Company A's proposal, including the valuation set forth in Company A's proposal.

45. The omission of this information renders the statements in the "Background to the Arrangement" section of the Proxy Statement false and/or materially misleading in contravention of the Exchange Act.

46. The Individual Defendants were aware of their duty to disclose this information and acted negligently (if not deliberately) in failing to include this information in the Proxy Statement. Absent disclosure of the foregoing material information prior to the stockholder vote on the Proposed Transaction, Plaintiff and the other stockholders of Harvest will be unable to make a sufficiently informed voting or appraisal decision in connection with the Proposed Transaction and are thus threatened with irreparable harm warranting the injunctive relief sought herein.

## COUNT I

**Against All Defendants for Violations of Section 14(a) of the
Exchange Act and SEC Rule 14a-9 Promulgated Thereunder**

47. Plaintiff repeats and realleges each and every allegation contained above, as though fully set forth herein.

48. During the relevant period, defendants disseminated the false and misleading Proxy Statement specified above, which failed to disclose material facts necessary in order to make the

statements made, in light of the circumstances under which they were made, not misleading in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

49. By virtue of their positions within the Company, the defendants were aware of this information and of their duty to disclose this information in the Proxy Statement. The Proxy Statement was prepared, reviewed, and/or disseminated by the defendants. It misrepresented and/or omitted material facts, including material information about Harvest's and Trulieve's financial projections, the data and inputs underlying the financial valuation analyses that support the fairness opinions provided by Moelis and Haywood, potential conflicts of interest faced by Haywood and the background of the Proposed Transaction. The defendants were at least negligent in filing the Proxy Statement with these materially false and misleading statements.

50. The omissions and false and misleading statements in the Proxy Statement are material in that a reasonable stockholder would consider them important in deciding how to vote on the Proposed Transaction.

51. By reason of the foregoing, the defendants have violated Section 14(a) of the Exchange Act and SEC Rule 14a-9(a) promulgated thereunder.

52. Because of the false and misleading statements in the Proxy Statement, Plaintiff is threatened with irreparable harm, rendering money damages inadequate. Therefore, injunctive relief is appropriate to ensure defendants' misconduct is corrected.

## COUNT II

**Against the Individual Defendants for Violation of Section 20(a) of the Exchange Act**

53. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

54. The Individual Defendants acted as controlling persons of Harvest within the

meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of Harvest and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

55. Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

56. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same. The Proxy Statement at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were, thus, directly involved in the making of this document.

57. In addition, as the Proxy Statement sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction. The Proxy Statement purports to describe the various issues and information that they reviewed and considered—descriptions which had input from the directors.

58. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

59. As set forth above, the Individual Defendants had the ability to exercise control

over and did control a person or persons who have each violated Section 14(a) and SEC Rule 14a-9, promulgated thereunder, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' conduct, Harvest's stockholders will be irreparably harmed.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands injunctive relief, in her favor and against defendants as follows:

A. Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction and any vote on the Proposed Transaction;

B. In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff;

C. Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

D. Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims and issues so triable.

Dated: July 27, 2021

Respectfully submitted,

/s/ Richard A. Acocelli
Richard A. Acocelli
**WEISSLAW LLP**
1500 Broadway, 16th Floor
New York, NY 10036
Telephone: (212) 682-3025
Facsimile: (212) 682-3010
Email: racocelli@weisslawllp.com

*Attorneys for Plaintiff*